Upon a rehearing the following opinions were filed at the October term, 1877:
By the Court,
Beatty, J.:
It is a subject of regret with the court that counsel for appellant did not avail themselves of the opportunity of a rehearing to elaborate their views of this case in an oral argument. The rehearing was ordered, not because we were convinced by the arguments advanced in the petition that our former decision was erroneous, but because, on account of the division of opinion in the court and the suggestion of counsel that they had been misled by the absence of the attorney-general at the time the case was first argued, we were desirous of affording them an opportunity to reply to the points made by the attorney-general and to convince us of our error, if we had committed one. They have chosen, however, to resubmit the case on their original brief, and their petition for a rehearing — assuming that the questions involved are too plain to admit of a difference of opinion, and that our former decision was the result of inadvertance and want of consideration. Counsel are mistaken in supposing that the case was decided without full consideration of all the points of their argument, or without a thorough knowledge of all that is contained in the record. The views of counsel are, in the main, those which were adopted in the dissenting opinion of the chief justice, and the fact that he differed with the other members of the court led to a thorough reconsideration of the majority opinion before it was filed. Upon such reconsideration we were satisfied, as we still are, that the decision was correct. We have only to regret that we did not modify one or two unguarded expressions in the opinion, which have led to a misconception of its meaning. We think that on a careful reading it ought not to be misunderstood; but, since it has been misunderstood by counsel for appellant, we are glad of the opportunity to restate our position more clearly, if we can.
*386 We will, however, before adverting to the point as to which we have been, misunderstood, pay some attention to other matters dwelt upon in the petition for rehearing.
Vigorous exception is taken to the opinion imputed to the court that the verdict in this case was a proper one. Counsel “ protest that there is no case on record where a man was convicted, by an impartial jury,.of murder upon the facts developed in this case.” They “can account for the verdict upon no hypothesis except that it was the result of hatred of Chinamen, with the fear of newspaper censure, together with the bold and glaring misstatements of the law by the court below.” They assert that “ the evidence all through shows that the defendant was acting under the most uncontrollable passion, induced by an act that would have impelled any rational being to do what he did.”
“Let us suppose,” they say, “that a white man finds his brother shot down in cold blood. He addresses the murderer immediately upon the perpetration of the act, and the only answer he gets is a threat against his own life. If, under such circumstances, he should immediately procure a weapon and kill the murderer of his brother, will any one say that such a man is guilty of murder ? We venture the statement that no jury in creation would convict him of any such crime, and ninety-nine out of a hundred would unhesitatingly acquit him altogether, and yet this court say that the jury in this case properly convicted this defendant. We cannot believe that the court has read the evidence with that care that it should.”
This vehemence of statement is perhaps not unbecoming, and at all events is pardonable, in counsel, whose sympathy for their client in cases of this character may always be expected to cloud their judgment to a greater or less extent, but we must be allowed to protest that we expressed no opinion as to the propriety of the verdict in this case. All we said, and all we were called upon to say, was that, under the testimony, which would have well warranted the jury in finding either that there' was no uncontrollable passion or that there was cooling time, it was proper' for the court to give instructions based upon that hypothesis. We venture *387 still to adhere to that opinion, and should do so even though the testimony for the defense had been as strong as counsel represent it. A prima facie case of murder was proved. The court could not assume that the jury would believe the testimony as to mitigating circumstances, but, on the contrary, had to assume, in giving its instructions, that, on the question of sufficient provocation or reasonable cooling time, the finding of the jury might be against the defendant. So the point decided would have been correctly decided if the testimony had been such as counsel imagine it to have been. But in truth the case bears a very slight resemblance to the version of it which we have quoted from the petition for a rehearing. ¥e should be sorry to be understood as saying that this verdict — murder of the second degree — was exactly the proper one. What we said, and what we repeat is, that the evidence warranted a graver verdict. The defendant did not “ find his brother shot down in cold blood.” He and his brother were in the street in front of Ah Long’s house. His brother was assailing Ah Long with the foulest and most abusive epithets, and challenging him to come out. He came out, not in cold blood, but in response to challenges and insults. He shot at defendant’s brother, but there is no testimony that he brought him down, or even injured him seriously. All we know is that itwas a flesh wound. Ah Long, then, was not the “murderer” of defendant’s brother, and his conduct was not unprovoked. If we were to adopt the notions of counsel, that the law ought to be made to fit the verdicts that the juries of the country have found, or would or would not find, we-might even say that Ah Long was justified; for we are not without experience in this state of verdicts of acquittal under circumstances quite as unfavorable to the defendants as these were to Ah Long.
The defendant did not kill Ah Long “immediately.” He was not seized with a sudden, uncontrollable impulse to slay. He did not rush off at once to procure a deadly weapon, but stopped to ask Ah Long why he had shot his brother. On receiving a threatening answer, he went and got his pistol for the purpose, he says, of shooting Ah Long *388 “if he saw him.” On this testimony alone it would have appeared that he got his pistol, not as a means of gratifying an impulse of passion, but as a measure of precaution or means of revenge. But his subsequent conduct is still more significant. Did he start in headlong pursuit of Ah Long, impelled by overmastering passion to seek his life, and oblivious of everything else? He did the very opposite. He saw the police capture Ah Long, gave up the pursuit himself without going near him at that time, and went for a surgeon to attend his brother’s wound. His passion was so far under his control that he could suspend the gratification of it until his brother was provided with a surgeon. This circumstance alone negatives the idea of irresistible passion, for unless counsel are going to contend— and it would be suicidal to do so — that he calculated upon getting a surgeon for his brother and getting back to the jail in time to intercept Ah Long before he was locked up, it proves that he had laid aside the notion of killing him for the time being.
• Moreover, there was, in the situation of Ah Long at the moment he was shot, much to disarm the passion of a reasonable man. He was a captive in the custody of the officers of the law, disarmed, helpless, and at the very door of the jail.
It was upon such testimony as this that the jury had to decide. We have not said, and we are not called upon to say, whether their verdict was the proper one or not. We are quite willing to say, however, that if it had been murder of the first degree, instead of murder of the second degree, it would have been well warranted by the testimony of the defendant himself. The verdict that was found, we think, may be accounted for without reference to hatred of Chinamen, fear of newspaper censure, or any supposed errors in the instructions. If the jury, giving the prisoner the benefit of every reasonable doubt, thought that he killed the deceased under the influence of uncontrollable passion, and without any mixture of deliberation, and if at the same-time they thought that the circumstances were not such as to justify the existence or persistence of irresistible *389 passion in a reasonable man, their verdict was perfectly consistent with the law, and was based upon a very charitable view of the defendant’s conduct.
Another matter to be disposed of before coming to the two instructions which were discussed in our former opinion, is the claim of counsel that, although the instructions which are said to have been given by the district court of its own motion are not in the record, and cannot, therefore, be made the basis of our decision, they ought, nevertheless, to be considered to a certain extent, and allowed some undefined weight in shaping our conclusions.
We think it ought not to be necessary to say that it is the duty of this court to decide the questions of law that are properly presented for its decision, without allowing itself to be prejudiced or influenced by matters of which it cannot take judicial cognizance. If these supposed instructions are not in the record, we do not know that they were ever given. If, notwithstanding our duty to ignore them, wo should choose to believe that they were given in the case, and if we should also consider them as flagrantly erroneous and as prejudicial to the defendant, as in the opinion of his counsel they were, we might not be able to consider the questions presented by the record as impartially as Ave ought, but just so far as we allowed ourselves to be influenced by such extraneous matters we should be derelict. What is in the record it is our duty to allow its full weight; Avhat is not in the record cannot be used as a make-weight to eke out an argument that would be incomplete Avithout it.
We come uoav to instructions numbers one and two, upon the construction of which our decision must turn. It is constantly assumed in the petition for a rehearing that, in our former opinion, we conceded those instructions to be clearly erroneous; that, taken by themselves, they misstated the law of this case. A careful reading of that opinion will convince counsel of their mistake. We never decided, and never intended to decide, the proposition which they so vigorously combat. We never entertained the opinion that where two instructions are given covering the same point, one clearly erroneous and the other clearly correct, *390 that the erroneous instruction is cured by the correct one. The proposition we endeavored to state and to enforce was this: Where two instructions are given on the same point, one clearly and unequivocally correct, the other ambiguous and susceptible of two constructions, according to one of which it is correct, but according to the other of which it is erroneous, since it is the duty of the jury to read and consider all the instructions together, they will put that construction upon the doubtful one which makes it consistent with the other, and reject that construction which brings the two in conflict. This is a principle of construction universally acknowledged, because it is obviously a reasonable principle, and because any contrary principio would be as obviously unreasonable.
Now, we did not assume in our former opinion all that we are charged with having assumed, but we do assume some things that the counsel think ought not to be assumed. It is the duty of juries to read and consider all the instructions of the court, and we presume that they do so. It is their duty to understand the instructions, and we assumed that, in the effort to find out their meaning, they resort to the same reasonable and obvious principles of construction by which courts are guided in the interpretation of a doubtful clause of a statute or a contract. Of course, if these assumptions are unfounded, our decision of this case is all wrong; but we' entertain no doubt of their correctness, and we think they fully support everything that has been decided.
We did not say in our former opinion that instruction number two misstated the law applicable to this case. We said that, taken by itself, it would bear the construction placed upon it by counsel, and that a jury might understand it in that sense. We said in One place, speaking of both instructions, “on such hypothesis they do not misstate the law; at least not in a manner which could possibly have prejudiced the defendant.” Here is an admission that in some particular they do misstate the law, and so they do. They assume to state the distinction, and the whole distinction, between murder of the first and murder *391 of the second degree; but they fail to do so, for the reason that there are cases of murder in •which the intent to kill need not exist, as where a killing is perpetrated in the commission or attempt to commit a felony. The same defect of these instructions is again alluded to at the close of the opinion, where it is said, speaking of number one: “It is neither a full nor a perfectly clear statement,” etc. It is not a full statement of the distinction between the two degrees of murder, because there is a class of cases in which the intent to kill need not exist. Therefore, because it assumed to be what it was not, we refrained, out of abundant caution, from saying unqualifiedly that it did not misstate the law, contenting ourselves with saying that it did not misstate the law of this particular case.
We said again, at the very close of the opinion, speaking of number two: “It is susceptible of a construction according to which it would be erroneous, and but for the clear and definite instruction on the subject of voluntary manslaughter, by which it was accompanied and qualified in this case, it must have been so construed.” We thought this expression was sufficiently guarded, but, perhaps, it was not. We did not mean that, if this instruction had stood alone and unqualified, the jury must have understood it in an erroneous sense; but merely this, that, as they might have so understood it, tue must have so construed it in .order to protect the defendant from a possible injury. It will be seen that this meaning is entirely consistent with the whole of the opinion, and that any other meaning is inconsistent with it. We thought it proper to express our disapproval of these instructions as models to be followed hereafter, but we stated explicitly our reasons for such disapproval. The instructions are not full, and they are not clear. Because they assume to state broadly the distinction between the two degrees of murder, and fail to do so, they are inaccurate; because, standing by themselves, they might be understood to mean that the bare intent to take life makes a homicide murder, they are not clear. These were the grounds, expressly stated, of our disapproval of them, and neither of these grounds avails *392 in this case. There was no question here of a homicide committed in the perpetration or attempt to perpetrate a felony; and that sense of the instructions in which they would have been erroneous was excluded by the clear and unequivocal meaning of another instruction.
Trusting that we have made the meaning of our former opinion clear, we will now proceed to consider the objections of appellant to what we did decide. He contends that there is no language in instruction number two which implies deliberation, and nothing in the instruction asked by himself that excludes the notion that a bare intent to kill makes a killing murder.
It is agreed upon all sides that an intent to kill exists in all cases of voluntary manslaughter, but in such cases the killing is intentional only in the sense of not accidental; it is voluntary, not the result of inadvertence. In voluntary manslaughter there must be no mixture of deliberation. The passion must be such as to exclude the power of reflection. The language of the instruction is: “A design, a determination, to kill, distinctly formed in the mind.” We think these words do, in their natural sense, imply deliberation. Certainly they mean a great deal more than the simple impulse to slay which characterizes manslaughter. The word “determination ” in this instruction is not used in any technieal sense; in fact, it has no technical sense in which it means less than it does in its popular signification. Webster defines it to be a “decision of a question in the mind; firm resolution; settled purpose.” Can it be said that a question can be decided, a wavering resolution made firm, or a hesitating purpose settled without'deliberation ?
The chief justice, in his dissenting opinion, has brought forward Bouvier’s definition of the word “intention” to prove that it means as much as “ determination,” and therefore that “determination to kill distinctly formed in the mind,” means no more than the impulse to slay which exists in manslaughter. We think there is a fallacy in this argument. Bouvier gives to the word “ intention” its broadest technical meaning — that Avhich is common to it as used not only in reference to criminal acts, but also in speaking of *393 the intention of a testator; of the parties to a contract; of the legislature. In all these cases the word implies the maturest deliberation, and it is the full equivalent of ‘ ‘ determination.” In reference to criminal acts, also, it is the exception, and not the rule, for intention to mean anything less than a deliberate purpose.' Out of the long list of crimes there are but two or three in which the intention to do the forbidden act can arise from a mere impulse of passion. To prove, then, that intention usually means as much as determination, does not prove that the latter ever means less than it is defined to mean, viz: The decision of a question in the mind; a firm resolution; a settled purpose. We remain of the opinion that the language of the instruction, strictly construed, does imply deliberation.
But we have conceded that it might have been misunder. stood if it had not been for the instruction given at defendant’s request, and counsel argue that that instruction could not have been taken to qualify the other in any way, because it related to another matter. One was on the subject of murder, they say, and the other on the subject of manslaughter. In answer to this objection we say murder and manslaughter are degrees of the same offense. If an instruction can be framed to define the one without in some measure defining the other, this case, at all events, does not illustrate the possibility. An instruction which tells a jury that “killing upon sudden heat of passion,” etc., is manslaughter, and not murder, may be fairly said to be on the subject of murder.
But counsel still contend that if this instruction is read in connection with the other, there is nothing in it to exclude the notion that a bare intent to kill makes the killing murder in all cases, even though it be a mere impulse of uncontrollable passion caused by an adequate provocation. It certainly does, exclude any such notion unless it can be maintained that this jury, in the face of the uncontradicted testimony of all the witnesses, including the defendant, might have understood the court to mean that if the defendant accidentally or inadvertently killed the deceased while laboring under the influence of uncontrollable pas *394 sion, then onfy was the killing manslaughter and not murder. But to adopt this view would, it seems to us, be equivalent to denying the jury any share of common sense. When people talk of a killing being done under the influence of sudden passion, they are never understood to be talking about an accidental or involuntary killing, and if it could be supposed that any jury ever would understand such language in such a sense, this jury at least could not have done so. The instructions must have been understood as having some reference to the testimony in the case, and there was no question here of an accidental killing. The killing was admitted, and the defendant swore that he armed himself for the very purpose of doing it.
Finally, it may be said that it is certain that this jury could not have understood the instructions complained of to mean that a bare intent to kill, without premeditation or deliberation, makes an unlawful killing murder. If they had so understood, they would have been compelled to find a verdict of murder in the first degree. The theory of counsel is, that the jurors in this case were impelled, by hatred of Chinamen and fear of the newspapers, to deal severely with the defendant, and that they understood the court to instruct them, that if the defendant killed Ah Long intentionally he was guilty not of simple murder, but of murder in the first degree. The fact that the killing was intentional was rendered certain by the testimony of the defendant himself. It follows that the duty and the inclination of the jurors concurred in demanding a verdict of murder in the first degree. But they found murder in the second degree. What sort of a theory is it which supposes that jurors will violate their sworn duty in order to go counter to their wishes and their fears ?
The judgment is affirmed.